**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Jamiel Alexander CHAGRA,
Defendant-Appellant.**

**No. 80–1377.**

United States Court of Appeals,
Fifth Circuit.

March 3, 1982.

Joseph S. Chagra, El Paso, Tex., Oscar B. Goodman, Las Vegas, Nev., for defendant-appellant.

LeRoy Morgan Jahn, Asst. U. S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before INGRAHAM and TATE, Circuit Judges.*

INGRAHAM, Circuit Judge:

After a jury trial in the Western District of Texas, Jamiel Alexander Chagra was convicted of aiding and abetting the possession of cocaine by another and operating a continuing criminal enterprise in violation of sections 401(a)(1) and 408 of the Comprehensive Drug Abuse Prevention and Control Act of 1970 (the 1970 Drug Act), 21 U.S.C. §§ 841(a)(1) and 848. The district court imposed a sentence of 30 years in prison, a fine of $125,000, and a life-time special parole term. We affirm the judgment of conviction in its entirety but modify the sentence imposed by the district court.

## I. BACKGROUND TO THIS APPEAL

### A. Facts of the Crimes.[1]

The evidence introduced at trial demonstrated that appellant had supervised several large scale narcotics importation and distribution operations. Most of the evidence related to events taking place during or after the summer of 1977.

During the summer of 1977, appellant met with Henry Wallace, an unindicted co-conspirator, and several other persons at the home of Charlie McCord in El Paso, Texas, to resolve some difficulties appellant was encountering in collecting his share of the proceeds from the importation of 1,800 pounds of marijuana into the United States from Mexico.[2] At this meeting, appellant informed Wallace that appellant had been in charge of this operation, owned the plane used to smuggle the marijuana into the United States, and employed the pilot, Jerry Wilson, but had not received his share of the load, 1,000 pounds, from Leslie Harris and McCord, two others involved in the scheme. Wallace agreed personally to assume an indebtedness to appellant of up to approximately $150,000 in cash, goods, or services, less the cost of the marijuana, to ensure appellant that he would receive his share. Appellant agreed, and Harris and McCord paid the Mexican source of the

---

* Due to his death on December 22, 1981, Judge Ainsworth did not participate in this decision. The case is being decided by a quorum. 28 U.S.C. § 46(d).

1. Appellant has not challenged the accuracy of the government's statement of the facts and, with only one exception—his obtention of substantial income or resources from his operation of a continuing criminal enterprise, section V, infra—also has not challenged the sufficiency of the evidence to support his convictions. Therefore, this statement of the facts of the offenses will be brief. The evidence fully supports appellant's convictions on both charges and the government's brief contains an extensive recitation of the facts.

2. While this was Wallace's first personal meeting with appellant, evidence introduced at trial demonstrated that appellant had been trafficking in narcotics prior to this time.

marijuana $50,000. Several weeks later, Wallace delivered six ounces of cocaine worth about $7,200 to appellant as partial payment on his indebtedness. Appellant later asked Wallace to arrange another airplane smuggling operation from Mexico, this time involving 2,000 pounds of marijuana, as a further debt payment. Wilson was again to pilot the plane. Wallace agreed.

This operation was not immediately undertaken because Wilson's plane was disabled. Appellant and Wallace along with Eddie Mitchell, allegedly appellant's cousin, therefore met in Berino, New Mexico, at Wallace's home and devised another scheme. They planned to smuggle six kilograms of cocaine from Colombia to the United States to boost appellant's finances which had sagged because of two failed importation ventures. One planeload of narcotics had crashed in Colombia and another had been seized by law enforcement authorities in Ardmore, Oklahoma. Appellant estimated that each kilogram would cost approximately $10,000. Wallace agreed to make the financial and transportation arrangements in the United States and appellant agreed to organize matters in Colombia. In late summer, Wallace raised over $20,000 from several individuals to fund the operation, recruited a new pilot, Jim French, because appellant had lost confidence in Wilson, purchased a new airplane in the name of one of the operation's investors, Richard Young, and had fuel tanks installed on the plane to extend its flying range. Appellant, however, had some difficulty in arranging matters in Colombia, and at a meeting with Wallace in October at appellant's Ft. Lauderdale, Florida, home, appellant convinced Wallace to replace Mitchell in Colombia. Appellant and Wallace also discussed using the proceeds from the cocaine importation scheme to finance a later marijuana sea smuggling operation.

Using false identification papers to avoid any difficulty in obtaining a passport because he was a convicted felon, Wallace obtained a passport under the name of Robert D. Rosson, an alias he had previously

used, and flew to Colombia. Wallace's instructions were to send Mitchell home, to obtain the cocaine and a landing site through Lionel Gomez, appellant's source of marijuana for previous schemes,[3] and to meet the plane when it arrived. Gomez was unwilling to supply appellant with cocaine on credit, however, because of several past failures, but he did introduce Wallace to Raul Royce whom Gomez thought might be willing to extend credit to appellant. Royce agreed to extend the necessary credit for the cocaine so long as Wallace agreed to remain in Colombia. Wallace agreed, and Royce later delivered six kilograms of cocaine to Gomez for Wallace.

Wallace then called William Dudley Connell in the United States, from whom Wallace had earlier but unsuccessfully sought to obtain funds for the cocaine scheme, to obtain money for payment to Royce. Connell was still unable to offer any financial assistance but he did contact Paul Taylor to determine whether Taylor might be interested in investing. After talking with Connell, Taylor left for Colombia to observe the operation. Taylor remained in Colombia only briefly, paid some of Wallace's bills, and then returned to the United States to discuss the operation with Connell.

In the United States, appellant attempted to interest several persons in importing narcotics. Appellant, French, and Taylor then flew to Colombia to pick up the cocaine. Wallace remained in Colombia to organize the importation of a boatload of marijuana.

Unable to convince either Gomez or Royce to extend credit for this operation, in late November or early December Wallace arranged with Jose Barros for 30,000 pounds of marijuana to be shipped aboard the DONA PETRA to Florida. Appellant expected to sell this marijuana for $250 per pound in 1,000 pound lots. Barros extended credit to appellant for almost all of the $2,400,000 purchase price. After Barros and appellant personally discussed the transaction by telephone, the marijuana was loaded aboard the DONA PETRA in

---

**3.** One scheme involved the importation of marijuana into Massachusetts.

mid-to late December and it set sail for Florida under the control of a boat captain supplied by appellant. Royce then permitted Wallace to leave Colombia after Wallace convinced Royce to accompany him to the United States to collect the $180,000 debt owed Royce. Both left Colombia for the United States and met with appellant on Christmas Day at appellant's home. Royce collected $40,000 of the amount owed him and returned to Colombia a few days later.

After returning to the United States, appellant sold Connell and Taylor one kilo of cocaine for $70,000 on credit in November and also agreed to earmark the profit from the sale of 5,000 pounds of marijuana for them. In early 1978, appellant also gave Young two ounces of the cocaine to sell at $1,500 per ounce. After selling some of the cocaine, Young exchanged the remainder and the proceeds from the portion already sold for four other ounces because the first two ounces were of poor quality.

The DONA PETRA arrived off the Florida coast in December of 1977. While searching for the DONA PETRA, appellant discovered two other marijuana laden freighters, the MISS CONNIE and the EC-OPESCA IV, in the Caribbean, and obtained permission to unload them. Unloading took place in two stages. The marijuana was first transferred from the freighters to large sport fishing boats, such as the MASTER PLAN, and was then transferred to smaller boats for final transportation to Florida. Appellant was assisted in this part of the operation by Hamilton Judd Myers, a professional boat captain hired by appellant to ferry him around the unloading area.[4] Under this plan, appellant was able to import 24,000 pounds of marijuana before the Coast Guard seized the mother ships MISS CONNIE and ECOPESCA IV and their remaining marijuana on December 27. The Coast Guard seized the DONA PETRA on December 30 before it could be unloaded, however.

Shortly thereafter, Wallace returned to South America to set up another marijuana shipment. Appellant again intended to smuggle 30,000 pounds of marijuana into the United States. Wallace gave Royce $130,000 in payment for cocaine and left radio navigational equipment and a boat captain in Colombia for the voyage. In return, Royce gave Wallace three kilograms of cocaine on credit, which Wallace in turn gave to appellant upon returning to Florida.

Wallace then left Florida for Texas in January 1978 to take care of some outstanding business for appellant. This included paying some of appellant's outstanding debts as well as threatening Connell should he and Taylor fail to pay appellant the $70,000 they owed appellant for the kilogram of cocaine. Returning to Florida later that month, Wallace assisted appellant in receiving and unloading boatloads of marijuana from Colombia. Wallace later returned to El Paso after receiving three kilograms of cocaine from John Quintoni, an associate of appellant's who often acted as appellant's "banker," and $140,000 in cash from appellant himself, $100,000 of which was for Wallace and $40,000 of which was for appellant's mother. Wallace again assisted appellant in later marijuana unloading operations off the Florida coast before finally breaking off business relations with appellant.

B. *Proceedings in the District Court.*

On February 26, 1979, the federal grand jury for the Midland-Odessa Division of the Western District of Texas returned an indictment against appellant accusing him of several violations of the federal narcotics laws. Trial was scheduled to be held before District Judge John Wood. On March 13, appellant filed several pretrial motions, including one to disqualify Judge Wood from presiding over his trial and one for a change of venue to a location outside the Western District of Texas, and preferably outside Texas altogether, because of allegedly prej-

---

4. Unbeknownst to appellant, Myers had previously assisted the U. S. Customs Service in drug cases. See pp. 248–249 *infra.*

udicial pretrial publicity. Judge Wood denied appellant's disqualification motion and his motion for a change of venue outside Texas, but granted appellant's motion for a change of venue and offered appellant the choice of having trial in Midland or Austin. Appellant chose Austin and Judge Wood set trial for May 29.

On May 2, we denied appellant's petition for a writ of mandamus to disqualify Judge Wood. Two weeks later, the federal grand jury for the El Paso Division of the Western District of Texas returned a superceding indictment against appellant adding a charge that he had conducted a continuing criminal narcotics enterprise in violation of 21 U.S.C. § 848 to the charges filed by the Midland-Odessa grand jury. Judge Wood then *sua sponte* continued the trial date from May 29 until July 23. On May 29, Judge Wood was killed near his home in San Antonio. Judge Sessions replaced Judge Wood as trial judge and trial was reset for August 1.

Before trial, Judge Sessions entertained several motions filed by appellant. For instance, he denied a motion to dismiss the El Paso indictment because of allegedly prejudicial pretrial publicity and also denied appellant's motion to dismiss the continuing criminal enterprise charge in the El Paso indictment because of alleged prosecutorial vindictiveness. He did require the government to elect among the charged offenses and the indictment was renumbered to include only four counts. Count one charged appellant with conspiracy to import marijuana into the United States from Colombia in violation of 21 U.S.C. §§ 952(a) and 963. Count two charged appellant with conspiracy to import cocaine into the United States from Colombia in violation of 21 U.S.C. §§ 952(a) and 963. Count three charged appellant with aiding and abetting the possession of cocaine by another in violation of 18 U.S.C. § 2 and 21 U.S.C. § 841(a)(1). Count four charged appellant with conducting a continuing criminal enterprise in violation of 21 U.S.C. § 848.[5] Judge Sessions denied appellant's motion for a change of

venue or for a continuance and trial began on August 1.

After both sides had rested, the jury was instructed to deliberate first on counts three and four and to consider counts one and two as lesser included offenses only if it could not return a guilty verdict on count four. On August 15, the jury found appellant guilty of both counts three and four and, accordingly, did not return a verdict on counts one or two.

Appellant then became a fugitive and was not sentenced until March 28, 1980. The district court imposed the sentence noted above and appellant brought this appeal.

## II. VINDICTIVE PROSECUTION

Appellant's opening argument is that his conviction for operating a continuing criminal enterprise should be reversed and the charge dismissed because the government levied this charge against him in retaliation for his attempts to avoid trial before Judge Wood. The government argues that it brought the § 848 charge after discovering a new witness who would assist in proving the continuing criminal enterprise charge and after a new prosecutor reassessed the evidence against appellant. We find no vindictiveness in this case.

 As a substantive matter, the constitutional authority to "take care that the laws [are] faithfully executed" is textually committed to the authority of the executive branch, U.S.Const. art. II, § 3; *United States v. Hamm*, 659 F.2d 624, 628 (5th Cir. 1981) (en banc), and the authority of the executive branch to enforce the law in a selective fashion is legally unchallengable absent proof by the defendant that the government has exercised its discretion upon an invidious basis such as race. *United States v. Batchelder*, 442 U.S. 114, 123–25 & n.9, 99 S.Ct. 2198, 2204 & n.9, 60 L.Ed.2d 755 (1979); *Bordenkircher v. Hayes*, 434 U.S. 357, 364, 98 S.Ct. 663, 668–69, 54 L.Ed.2d 604 (1978); *Oyler v. Boles*, 368 U.S. 448, 456, 82 S.Ct. 501, 506, 7 L.Ed.2d 446 (1962). As a procedural mat-

---

**5.** A copy of the renumbered indictment is attached as an appendix.

ter, the government may obtain a superceding indictment against a defendant at any time prior to trial and may select which indictment to proceed under at trial. *United States v. Stricklin*, 591 F.2d 1112, 1115 n.1 (5th Cir. 1979) (collecting cases). At the same time, however, the government may not exercise its authority to prosecute a defendant when simply and purposely done in order to punish a defendant in retaliation for his exercise of his rights rather than to further a legitimate law enforcement interest. *Blackledge v. Perry*, 417 U.S. 21, 94 S.Ct. 2098, 40 L.Ed.2d 628 (1974); *United States v. Walker*, 514 F.Supp. 294, 311–13, 316–23 (E.D.La.1981). The due process clause establishes this limitation on the government's charging authority as part of the principle forbidding the government from imposing punishment upon innocent conduct. *United States v. Walker, supra*, 514 F.Supp. at 316–19. The government's decision to "up the ante" against a defendant by filing new charges after he has taken some step in his defense may constitute an impermissible punishment in some cases, *e.g., Blackledge v. Perry, supra*, 417 U.S. 21, 94 S.Ct. 2098, but where the government's purpose for its charging decision can be traced to a legitimate, nonvindictive rationale, such as the discovery of a new witness or a different approach to a case by a new prosecutor, *see United States v. Phillips*, 664 F.2d 971, 996–997 (5th Cir. 1981); *Hardwick v. Doolittle*, 558 F.2d 292, 301 (5th Cir.), *supplemented on petition for rehearing and rehearing en banc*, 561 F.2d 630 (1977), *cert. denied*, 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978), the government may proceed with its new charges.[6]

▇ The second indictment arose out of the following scenario.[7] The Midland-Odessa federal grand jury returned an indictment against appellant on February 26, 1979, which did not contain a continuing criminal enterprise charge. In mid-March, Archie Pierce replaced James Kerr as the chief government prosecutor and began an independent examination of the evidence against appellant. While Pierce was analyzing the evidence in the file, Hamilton Judd Myers was arrested on a narcotics charge and agreed to testify for the government that appellant had supervised marijuana unloading operations off the Florida

---

6. We have taken two distinct approaches to the application of this principle to a specific case. In some cases, we have examined the context in which a defendant seeks to invoke this principle to determine whether the government was prompted by a retaliatory intent in his case. *United States v. Phillips*, 664 F.2d 971 (5th Cir. 1981); *United States v. Shaw*, 615 F.2d 251 (5th Cir. 1980) (per curiam); *United States v. Thomas*, 593 F.2d 615 (5th Cir.), *modified on rehearing*, 604 F.2d 450 (1979) (per curiam), *appeal after remand*, 617 F.2d 436, *cert. denied*, 449 U.S. 841, 101 S.Ct. 120, 66 L.Ed.2d 48 (1980); *Miracle v. Estelle*, 592 F.2d 1269 (5th Cir. 1979); *Jackson v. Walker*, 585 F.2d 139 (5th Cir. 1978); *Hardwick v. Doolittle*, 558 F.2d 292 (5th Cir.), *supplemented on petition for rehearing and rehearing en banc*, 561 F.2d 630 (1977) (per curiam), *cert. denied*, 434 U.S. 1049, 98 S.Ct. 897, 54 L.Ed.2d 801 (1978). The analysis we have followed in these cases is discussed at *United States v. Walker, supra*, 514 F.Supp. at 313–15. In other cases, we have examined the context in which a defendant claims retaliation in order to determine whether this doctrine was applicable to that context in any case. *Ehl v. Estelle*, 656 F.2d 166 (5th Cir. 1981); *Frank v. Blackburn*, 646 F.2d 873 (5th Cir. 1980) (en banc), *modified*, 646 F.2d 902 (en banc) (per curiam), *cert. denied*, —— U.S. ——, 102 S.Ct.

148, 70 L.Ed.2d 123 (1981). *See Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). Unlike most of our cases, appellant's claim arises in the pretrial context; specifically, the government filed an additional charge before trial but after appellant had filed a motion to recuse Judge Wood. At least one court has held that the vindictiveness doctrine is inapplicable to the pretrial stages of a criminal case absent prosecutorial misconduct. *State v. Stevens*, 96 N.M. 627, 633 P.2d 1225 (1981). None of our prior cases have considered this question and we also decline to address it today because, assuming that a prosecutor's decision to augment the charges against a defendant prior to trial can ever implicate the vindictiveness doctrine, we do not believe that the government's decision here was infected with any retaliatory intent.

7. The evidence relevant to this issue was developed at an evidentiary hearing held by Judge Sessions prior to trial. After hearing testimony on this claim, the district court denied the vindictiveness claim. Much of the evidence regarding Myers was later developed during the defendant's presentation of his own case at trial.

Coast. Myers had previously assisted the United States Customs Service in narcotics matters but was not acting on behalf of the government during the time he was employed by appellant. On March 13, appellant requested Judge Wood to recuse himself. Judge Wood denied this motion on April 2 and we denied appellant's petition for a writ of mandamus on May 2. After concluding his examination, Pierce concluded that the evidence justified a continuing criminal enterprise charge and sought approval from the Justice Department to seek a superceding indictment containing that charge in early to mid-May. Obtaining permission, Pierce presented the evidence to the El Paso federal grand jury and obtained a superceding indictment containing a § 848 charge on May 22. This was the indictment under which the government proceeded at trial.

From our examination of the record, we believe that the government's decision to obtain a continuing criminal enterprise charge was neither caused by appellant's efforts to avoid trial before Judge Wood nor intended to punish appellant for those efforts. *Cf. United States v. Walker, supra,* 514 F.Supp. at 316–23. The decision to seek a superceding indictment was not motivated by vindictiveness but instead was the product of a legitimate desire to bring appellant to book for his continuing, large-scale narcotics operations. The timing of appellant's recusal attempt and the return of the superceding indictment was mere happenstance; neither event was causally related to the other.[8] Accordingly, we reject appellant's argument that he was subjected to impermissible retaliation.

### III. PRETRIAL PUBLICITY

Appellant's next contention is that he was denied the right to a fair trial by an impartial jury because of widespread, adverse pretrial publicity.[9] A defendant is entitled to a fair trial by an impartial jury which will render its verdict based upon the evidence and arguments presented in court without being influenced by outside, irrelevant sources. *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). Exposure to pretrial publicity does not render a venireman unfit to serve as a juror *per se. United States v. Hawkins,* 658 F.2d 279, 283 (5th Cir. 1981); *Calley v. Callaway,* 519 F.2d 184, 205–06 (5th Cir. 1975) (en banc), *cert. denied,* 425 U.S. 911, 96 S.Ct. 1505, 47 L.Ed.2d 760 (1976). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based upon the evidence presented in court." *Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1643 (citations omitted). *Accord Murphy v. Florida,* 421 U.S. 794, 799–800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975).

An appellant can obtain a reversal of his conviction because of pretrial publicity in three different circumstances.[10] First,

---

8. Noticeably absent from this case is any apparent motive for retaliation on the government's part because the government *successfully* opposed appellant's recusal efforts. The absence of any apparent motive for retaliation buttresses our conclusion that no retaliation was intended. *Cf.* W. LaFave & A. Scott, Handbook on Criminal Law § 29, at 208 (1972) (lack of motive permits an inference of absence of intent).

9. To distinguish among the different categories of persons involved in the *voir dire* in this case, we will use the terms "jury" or "juror" to refer to those persons finally seated as jurors, the terms "panel" or "panel member" to refer to those persons questioned during *voir dire,* and the terms "venire" or "veniremen" to refer to those persons called for potential service as jurors but not questioned on *voir dire.*

10. Many of the cases cited by appellant are inapposite to the claim he raises here. Cases involving publicity disseminated during trial, such as *Marshall v. United States,* 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam) and *United States v. Williams,* 568 F.2d 464 (5th Cir. 1978), must be distinguished from cases, such as this one, involving only pretrial publicity. The standard of review, at least on direct review within the federal system, is stricter in the former category of cases than in the latter because of the greater possibility of prejudice and the greater difficulty at exorcising that prejudice. *Baldwin v. Blackburn,* 653 F.2d 942, 948 (5th Cir. 1981); *United States v. Williams, supra,* 568 F.2d at 468. Similarly, cases involving some taint of the trial process or jury deliberations from outside sources in addition to or other than media publicity, such as *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct.

he can demonstrate an actual, identifiable prejudice attributable to the publicity in question on the part of a member of the jury which decided his case. *Irvin v. Dowd, supra,* 366 U.S. at 723, 81 S.Ct. at 1642; *Mayola v. Alabama,* 623 F.2d 992, 996 (5th Cir. 1980), *cert. denied,* 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). An appellant must prove that such prejudice existed " 'not as a matter of speculation but as a demonstrable reality.' " *United States ex rel. Darcy v. Handy,* 351 U.S. 454, 462, 76 S.Ct. 965, 970, 100 L.Ed. 1331 (1956) (citation omitted). Proof of such prejudice is normally made by reliance upon the juror's *voir dire* responses. *Mayola v. Alabama, supra,* 623 F.2d at 996. Second, an appellant can demonstrate that prejudicial, inflammatory publicity about his case so saturated the community from which his jury was drawn as to render it virtually impossible to obtain an impartial jury. *Murphy v. Florida, supra,* 421 U.S. at 798–99, 95 S.Ct. at 2035–36; *Mayola v. Alabama, supra,* 623 F.2d at 996–97. Proof of such poisonous publicity raises a presumption that appellant's jury was prejudiced, relieving him of the obligation to establish actual prejudice by a juror in his case. *Mayola v. Alabama, supra,* 623 F.2d at 997. This presumption is rebuttable, however, and the government may demonstrate from the *voir dire* that an impartial jury was actually impanelled in appellant's case. *Id.* at 1000–01. If the

government succeeds in doing so, the conviction will stand despite appellant's showing of adverse pretrial publicity. *Id.* at 1001. Finally, an appellant can establish both that pretrial publicity about his case raised "a significant possibility of prejudice," *United States v. Davis,* 583 F.2d 190, 196 (5th Cir. 1978), and that the *voir dire* procedure followed by the district court in his case failed to provide a " 'reasonable assurance that prejudice would be discovered if present.' " *United States v. Hawkins, supra,* 658 F.2d at 283 (citations omitted). But, "[b]ecause the obligation to impanel an impartial jury lies in the first instance with the trial judge, and because he must rely largely on his immediate perceptions, federal judges have been accorded ample discretion in determining how best to conduct the *voir dire.*" *Rosales-Lopez v. United States,* 451 U.S. 182, 188, 101 S.Ct. 1629, 1634, 68 L.Ed.2d 22 (1981) (plurality opinion). *See also United States v. Gerald,* 624 F.2d 1291, 1296 (5th Cir. 1980), *cert. denied,* 450 U.S. 920, 101 S.Ct. 1369, 67 L.Ed.2d 348 (1981). Therefore, the district court's decision to employ a particular procedure will not be lightly overturned. *United States v. Hawkins, supra,* 658 F.2d at 283 (citation omitted).

Appellant has not identified any actual prejudice on the part of any of the jurors in his case and we have found none. Instead,

1507, 16 L.Ed.2d 600 (1966) (massive publicity before and during trial and "carnival atmosphere" at trial); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (intrusive videotelecast of trial); and *Turner v. Louisiana,* 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965) (contact between witnesses, deputy sheriffs, and jurors during trial and deliberations), must also be distinguished from cases involving pretrial publicity alone for essentially the same reasons that cases involving publicity during trial must be distinguished from pretrial publicity cases. *See also United States v. Haldeman,* 181 U.S.App.D.C. 254, 559 F.2d 31, 61 n.32 (1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977) (cases involving preventable intrusions into the trial process such as *Sheppard* provide a greater justification for presuming prejudice than cases in which the district court takes appropriate steps to assure defendant a fair trial). Appellant has not contended that any publicity released dur-

ing trial affected his case or that there was any intrusion into the trial process or jury deliberations. Accordingly, cases of these two different types do not assist appellant in his pretrial publicity claim.

*Groppi v. Wisconsin,* 400 U.S. 505, 91 S.Ct. 490, 27 L.Ed.2d 571 (1971), also cited by appellant, is also inapposite. In *Groppi,* the Supreme Court held unconstitutional a state statute preventing a trial court from granting a misdemeanor defendant a change of venue regardless of the extent of local prejudice against him or the inability of one or more continuances to safeguard his right to a fair trial. *Id.* at 507–08, 91 S.Ct. at 492. *Groppi* was not based on the extent of prejudicial pretrial publicity, and the Supreme Court even noted that there was no evidence of the extent of pretrial publicity in the record since Groppi had not been permitted to offer such proof because of the statute involved. *Id.* at 508 n.5, 91 S.Ct. at 492 n.5.

appellant pursues both of the last two paths, contending that the publicity in his case necessarily denied him the right to a fair trial and that the district court's jury selection procedure failed to assure him an impartial jury in the face of that publicity. Appellant also contends that we should reverse his conviction and remand his case for retrial outside of the Western District of Texas under our authority to supervise the administration of justice in the district courts. After reviewing the evidence in the record, we conclude the appellant was afforded a fair trial by an impartial jury.

Appellant has presented extensive support for his claim. This evidence can be classified into four categories: (1) national publications, such as articles in Newsweek, Time, and U. S. News and World Reports magazines, and a segment of the nationally syndicated network magazine show "20/20"; (2) local newspaper publications; (3) a public opinion poll taken in the Austin vicinity; and (4) the voir dire responses of several jurors that they could not be impartial. This evidence included the events occurring prior to appellant's trial, such as the attempted killing of a government prosecutor, the killing of appellant's brother Lee and Judge Wood, background evidence of his brother's criminal defense practice and flamboyant life style, the narcotics problems in El Paso, and the speculation that all these events were related. This evidence does demonstrate that events leading up to appellant's trial received extensive media coverage. Nevertheless, we have some difficulty in concluding that he has established that the Austin community was presumptively prejudiced against him.

The principle of presumptive prejudice, which originated in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663

(1963), "is only 'rarely' applicable," and "is confined to those situations where the petitioner can demonstrate an 'extreme situation' of inflammatory pretrial publicity that literally saturated the community in which his trial was held." *Mayola v. Alabama, supra,* 623 F.2d at 997 (citation omitted) Moreover, "[t]o satisfy his burden even in such sensational cases, the petitioner must ... demonstrate that the populace from which his jury was drawn was widely infected by a *prejudice* apart from mere familiarity with the case." *Id.* at 999 (emphasis in original). Each of appellant's categories of proof is flawed in some respect.

■ Appellant has not demonstrated the circulation of the three national magazines in the Austin area or the number of persons who may have viewed the telecast relating to his case among the class of persons eligible for jury service. *Cf. Mayola v. Alabama, supra,* 623 F.2d at 998–99. In addition, each of the three publications was a brief, straightforward, unemotional news story of Judge Wood's death rather than a long harangue condemning appellant. *Cf. Murphy v. Florida, supra,* 421 U.S. at 800 n.4, 802, 95 S.Ct. at 2036 n.4, 2037; *Beck v. Washington,* 369 U.S. 541, 556, 82 S.Ct. 955, 963, 8 L.Ed.2d 98 (1962); *Calley v. Callaway, supra,* 519 F.2d at 206. Appellant has introduced numerous local newspaper articles but there is only a handful of publications originating in the Austin vicinity, the area from which his jury was selected, and we can not conclude that the scale of the publicity in Austin matched that in El Paso without support in the record. Furthermore, none of the Austin articles contains any material that would have produced the type of prejudicial impact that resulted from the televised confession in *Rideau,*[11]

---

11. In *Rideau,* the Supreme Court reversed a state conviction where the defendant's uncounseled confession had been filmed and a 20-minute telecast of it had been shown three times by a local television station to large audiences in the parish from which his jury was drawn less than two months later. While the prejudicial impact of televising a defendant's confession is obvious, *cf. Parker v. Randolph,* 442 U.S. 62, 72, 99 S.Ct. 2132, 2139, 60 L.Ed.2d 713

(1979) (plurality opinion) (because "[t]he defendant is 'the most knowledgeable and unimpeachable source of information about his past conduct,' " a defendant's confession is " 'probably the most probative and damaging evidence that can be admitted against him' "; citation omitted), the dissemination of opinions by third parties may well be less influential. A jury may have difficulty in disbelieving or forgetting a defendant's opinion of his own guilt but have

and appellant has overstated his case to some degree regarding even the El Paso publicity.[12] Finally, it is also interesting to note that in his request for a change of venue filed on the eve of trial appellant suggested that his trial be transferred from Austin to El Paso. This indicates that he did not believe that even the extensive publicity in El Paso would prejudice his right to trial by an impartial jury. The poll introduced by appellant does buttress his argument that the Austin community was prejudiced, but such evidence is subject to a variety of errors. *United States v. Haldeman*, 181 U.S.App.D.C. 254, 559 F.2d 31, 64 n.43 (1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977). Finally, the number of veniremen expressing an opinion during *voir dire* that they could not be impartial does not approach the number in *Irvin v. Dowd, supra*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, in which 90 percent of the veniremen examined on this point were inclined to believe that the accused was guilty. *Cf. Murphy v. Florida, supra*, 421 U.S. at 802–03, 95 S.Ct. at 2037–38. Nevertheless, even if each category of evidence were not convincing by itself—a judgment we do not make—all four categories considered together could establish a presumption that the Austin community was prejudiced. However, we need not answer either of these questions, or determine whether appellant has established sufficient proof of prejudice to invoke the presumptive prejudice rule, because, assuming that he has, we conclude that the government

has proven that appellant was in fact tried by an impartial jury. *Mayola v. Alabama, supra*, 623 F.2d at 1001.

Only one of the twelve jurors was acquainted with any publicity about this case. The other eleven jurors knew nothing about this case at all from any source. The only juror with any contact with the pretrial publicity stated that she had read an article about appellant's family in one newspaper. In response to the district court's questioning, she also stated that she had no preconceived notion, bias, or prejudice for or against the defendant or the government from her reading of this one article and that she did not draw any connection between Judge Wood's death and appellant's case. After completing its questioning of this juror, the district court asked whether there were any other questions and the defense offered none. The defense never challenged this juror for cause.[13] We conclude that the government has carried its burden of proving that "an impartial jury was actually impanelled." *Mayola v. Alabama, supra*, 623 F.2d at 1001. Eleven of the twelve jurors had no contact with the pretrial publicity relevant to this case. This is sufficient to demonstrate that they were not tainted by it. *Id.* In light of the minimal contact with the publicity the other juror had and the fact that the defense apparently did not believe that she had been prejudiced by this contact or would be biased, as evidenced by the defense's failure to question her further when given the

---

no difficulty in rejecting the opinions of others because they may not be well-founded. *Compare Jackson v. Denno*, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) *with Watkins v. Sowders*, 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981).

**12.** Many of the articles do not mention or relate to this case, are too remote in time to be relevant, or appeared in newspapers from other states, as well as some from Mexico. Furthermore, most of the articles are straightforward, unemotional news stories of brief to medium length. *Cf. Murphy v. Florida, supra*, 421 U.S. at 800 n.4, 802, 95 S.Ct. at 2036 n.4, 2037; *Beck v. Washington*, 369 U.S. 541, 556, 82 S.Ct. 955, 963, 8 L.Ed.2d 98 (1962); *Calley v. Callaway, supra*, 519 F.2d at 206. In addition, some of the articles mentioning appellant or circum-

stances relevant to his case related to information properly brought out at his trial, *e.g.*, the Columbian rescue attempt, or that appellant himself introduced, *e.g.*, his gambling. *Cf. Stroble v. California*, 343 U.S. 181, 195, 72 S.Ct. 599, 606, 96 L.Ed. 872 (1952); *United States v. Haldeman*, 181 U.S.App.D.C. at 284, 559 F.2d at 61 n.34. While we do not deny that appellant has submitted extensive evidence in support of his claim, we do note that much of the evidence is irrelevant.

**13.** The defense asserted only one challenge for cause. While this challenge was initially denied, the panel member was later excused after indicating to the district court that he did not feel that he could be impartial.

opportunity or to challenge her for cause, we also conclude that this juror was not prejudiced by the article she had read and could put it aside and base her decision upon the evidence in the case. *Cf. United States ex rel. Darcy v. Handy, supra*, 351 U.S. at 463, 76 S.Ct. at 970. Therefore, despite the publicity which preceded this trial, we believe that the twelve jurors who ultimately decided appellant's case were fair and impartial.

■ We also conclude that the *voir dire* procedure employed by the district court was "capable of giving 'reasonable assurance that prejudice would be discovered if present.'" *United States v. Hawkins, supra*, 658 F.2d at 283 (citations omitted). *Accord United States v. Davis, supra*, 583 F.2d at 196–98. The district court followed the procedure we recommended in *Davis*.[14]

At the beginning of *voir dire*, the district court asked the panel as a whole whether anyone had any knowledge about the case from any source and whether anyone had any reason to believe that he could not be impartial.[15] The district court then individually questioned each panel member who indicated that he had some such knowledge or opinion at the bench in the presence of counsel for both parties but outside the presence of the remaining panel members and the venire. This questioning explored both the scope and depth of the panel member's knowledge of and attitudes towards the case. The district court repeated this process for the original panel with more specific inquiries addressed to several particularly sensitive areas [16], including the assassination of Judge Wood,[17] in order to

14. In *Davis*, we held that the procedures outlined in *United States v. Hyde*, 448 F.2d 815, 848 n.38 (5th Cir. 1971), *cert. denied*, 404 U.S. 1058, 92 S.Ct. 736, 30 L.Ed.2d 745 (1972) and the ABA Standards Relating to Fair Trial and Free Press § 3.4(a) (Approved Draft 1968) were acceptable *voir dire* procedures for a district court to follow in cases of this type. According to this procedure, a district court should determine which, if any, panel members may have had some knowledge of or attitudes about the case from pretrial publicity and should examine each such panel member outside the presence of the remaining panel members and the venire with an eye towards discovering the depth and breath of that knowledge or attitude rather than as a means of educating him about his responsibilities as a juror. The district court should then make an independent determination whether the panel member can and will be impartial. This questioning and any comments by the district court should be preserved for appellate review.

15. Appellant contends that the use of collective questioning of this type failed to ensure that potential prejudice would be uncovered and makes much ado about the fact that several jurors "never uttered a single word during the entire [*voir dire*] proceeding." Appellant's Opening Brief at 20. His argument, however, makes much ado about nothing. The district court followed the procedure recommended in *Davis* after asking the panel as a whole, for instance, whether anyone had any knowledge about the case from any source. The use of such collective questions to identify the individuals possibly having knowledge about the case followed by a separate examination of each such individual is entirely acceptable. It was the absence of such a followup examination

that lead to reversal in *Davis* and *Hawkins*, not the use of collective questions to identify those persons for whom further questioning is necessary. Furthermore, a person's failure to respond to an inquiry inviting a response—and which, as the district court here repeatedly informed the panel, *demanded* a response—may under those circumstances be accepted by the court as indicating a negative response.

16. The district court also asked the panel whether anyone had any knowledge from any source about appellant or about any other charges against appellant in connection with narcotics, whether anyone had ever discussed appellant or his legal problems with anyone, whether evidence that appellant gambled would prejudice anyone against appellant, and whether anyone would give different weight to witnesses of different nationalities.

17. The district court asked the panel whether anyone knew of Judge Wood's assassination and all panel members indicated that they had. The district court then instructed the panel that appellant was on trial only for the charges in the indictment and for nothing else, that their knowledge of Judge Wood's assassination must not be permitted to affect their obligation to be impartial, and that their decision on each charge of the indictment must be made independent of the other charges and based solely upon the evidence admitted in court. Following that admonition, the court asked whether any panel member recalled reading about or hearing of appellant's name in connection with Judge Wood's murder. Three panel members responded affirmatively. One stated that he could not disregard that knowledge and was

address the areas of particular concern to this case.[18] Each time a new venireman replaced a panel member who had been excused, the district court repeated the previous collective questions for the new panel member, and followed the same individualized procedure for each new panel member who indicated that he had any knowledge of or opinion about the case. At the conclusion of its separate questioning of an individual panel member, the district court offered counsel for both parties the opportunity to recommend further inquiries. In most instances, the defense did not recommend any new questions. The district court then either excused the panel member or permitted him to retake his seat with the others. The district court also repeatedly admonished the panel members during *voir dire*, and the jury later during trial, of their obligation to be impartial and reminded them of their responsibility to come forward and inform the court of anything that might impair their ability to discharge their obligations. The *voir dire* in this case reflects a conscientious effort by the district court, conducted in accordance with our recommendations in *Davis*, to perform a thorough inquiry into the possibility that pretrial publicity had biased the potential jurors. We cannot fault the district court.

■ Finding no constitutional or procedural error, we must address appellant's contention that we should exercise our authority to supervise the administration of justice in the district courts to grant him a new trial. He relies largely upon *Marshall v. United States*, 360 U.S. 310, 79 S.Ct. 1171, 3 L.Ed.2d 1250 (1959) (per curiam) in support of his argument.[19] We have previously

excused; two stated that they could disregard what they had heard and were permitted to remain on the panel but neither was ultimately selected as a juror. Next, the district court collectively asked the panel whether anyone thought that there was any connection between Judge Wood's assassination and any of his cases, and specifically this case, and whether anyone thought that there was any connection between Judge Wood's assassination and the charges against appellant. The panel responded negatively to each inquiry.

Appellant compares this questioning to the *voir dire* in *Davis* and *Hawkins* and contends that it was too abbreviated to ensure that he received a fair trial. He particularly challenges the district court's failure to discover the extent of the panel members' knowledge of the facts surrounding Judge Wood's death. Unlike *Davis* and *Hawkins*, however, the district court did not simply admonish the panel to disregard whatever extrajudicial information or opinions they had. The district court pursued this topic to determine whether anyone drew any connection between Judge Wood's death and appellant. That the district court asked the panel these questions collectively rather than individually is irrelevant in light of the negative responses the district court received. *See* note 15 *supra*. Furthermore, in determining whether the *voir dire* was capable of ferreting out prejudice we must examine the entire *voir dire*. The district court repeatedly commanded the panel members to inform the court of any information they might have about the case and of anything that might keep them from being impartial. That several persons did so, sometimes well after the *voir dire* had shifted to another topic or person, indicates that the panel members understood their responsibility in

this regard. Finally, the district court's inquiries on this topic were essentially the same as those proposed by the defense. We may not lightly overturn the judgment of the district court, *United States v. Hawkins, supra*, 658 F.2d at 283, and find no error here.

18. The district court also collectively asked the panel about the members' prior service on any state or federal grand or petit juries or on any general or special courts martial, whether any panel member had any law enforcement background himself or had a relative or close personal friend in law enforcement, whether any panel member would accord greater weight to the testimony of a law enforcement officer simply because of that fact, as well as other questions. By the conclusion of the *voir dire*, the district court had covered the majority of areas of interest reflected by appellant's proposed *voir dire* questions. Therefore, appellant's claim that "virtually nothing was known about the jurors who served on the petit jury," Appellant's Opening Brief at 20, is belied by the record.

19. Appellant also relies upon *United States v. Provenzano*, 620 F.2d 985 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980) and *United States ex rel. Doggett v. Yeager*, 472 F.2d 229 (3d Cir. 1973) but neither case assists him. *Yeager* involved publicity released during trial which we have held to a stricter standard of scrutiny than pretrial publicity. *See* note 10 *supra*. *Provenzano* is factually distinguishable. Also, the Third Circuit rejected Provenzano's pretrial publicity claim so that court's avowal of a higher standard (or lower threshold) for federal trials involving pre-

declined the invitation to rely upon our supervisory powers to overturn a conviction without constitutional infirmity in a case in which the district court took appropriate steps to ensure that the defendant received a fair trial by an impartial jury despite extensive pretrial publicity. *United States v. Capo*, 595 F.2d 1086, 1092 n.6 (5th Cir. 1979), *cert. denied*, 444 U.S. 1012, 100 S.Ct. 660, 62 L.Ed.2d 641 (1980). *See also United States v. Haldeman, supra*, 181 U.S.App. D.C. at 285, 559 F.2d at 62–63 (declining to rely on supervisory powers). We follow that route again. In *Marshall*, the Supreme Court relied upon its supervisory powers to reverse a federal conviction in a case in which highly prejudicial information regarding the defendant's prior criminal record, excluded from evidence by the trial judge, reached the jury during trial and effectively erased the accused's only defense. Here, the only publicity at issue occurred prior to trial, did not eviscerate appellant's only defense, and did not even reach most of the jurors. The Court observed in *Marshall* that "each case must turn on its special facts," *Marshall v. United States, supra*, 360 U.S. at 312, 79 S.Ct. at 1173, and *Marshall* and this case are quite dissimilar factually. In addition, as the Supreme Court and this Court have previously noted, the principle behind *Marshall* is that "persons who have learned from news sources of a defendant's prior criminal record are presumed to be prejudiced." *Murphy v. Florida, supra*, 421 U.S. at 798, 95 S.Ct. at 2035; *United States v. Williams*, 568 F.2d 464, 469 (5th Cir. 1978). That principle is not relevant to this case. Moreover, we have already exercised our supervisory power to some extent by recommending that the district courts follow the procedures set out in *Davis* to impanel a jury when there is a significant possibility that adverse pretrial publicity could affect the trial. Just as "the dynamics of constitutional interpretation do not compel constant extension of every doctrine announced by

the Court," *United States v. Mandujano*, 425 U.S. 564, 580, 96 S.Ct. 1768, 1778, 48 L.Ed.2d 212 (1976) (plurality opinion); *see also Hudson Water Co. v. McCarter*, 209 U.S. 349, 355, 28 S.Ct. 529, 531, 52 L.Ed. 828 (1908), so too the authority to supervise the administration of justice in the district courts does not mandate continuous expansion of procedural protections for the governance of criminal trials. Finally, we do not believe that we should exercise our supervisory authority to second-guess the judgments of the district courts on this issue when those courts have taken appropriate steps to ensure that the accused receives a fair trial. The opportunity to see and hear the panel during *voir dire* provides a district court with a richer basis for gauging a person's fitness for jury service than we can ever obtain from reading a *voir dire* transcript because "the manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record." *Reynolds v. United States*, 98 U.S. 145, 156–57, 25 L.Ed. 244, 247 (1879). *Cf. Rosales-Lopez v. United States, supra*, 451 U.S. at 188, 101 S.Ct. at 1634. The district court followed the recommendations we set out in our prior cases and had the opportunity to observe the panel during *voir dire*. We decline to second guess the judgment that the district court made.

In conclusion, we reject appellant's argument that his conviction should be reversed because of adverse pretrial publicity.

## IV. EVIDENCE OF PRIVATE WEALTH

Appellant argues that the district court erred by admitting evidence of his purchase of two expensive, private residences because there was no evidence to connect these purchases with his operation of a continuing criminal enterprise.[20] We find no error in the admission of this evidence.

---

trial publicity was dicta. To the extent that it was not, we choose to follow the course we previously took in *Capo* and the District of Columbia Circuit took in *Haldeman*.

20. One was a $245,000 home in Las Vegas, Nevada, for which appellant supplied a $75,000 cash down payment, and the other was a $340,-000 home in Pompano, Florida, financed by

To prove a continuing criminal enterprise charge, the government must establish that the defendant engaged in a continuing series of felony violations of the federal narcotics laws in concert with five or more persons under his management or supervision, and that he obtained substantial income or resources from this conduct. *United States v. Phillips, supra*, 664 F.2d at 1012–1013; *United States v. Michel*, 588 F.2d 986, 1000 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *United States v. Bolts*, 558 F.2d 316, 320 (5th Cir.), *cert. denied*, 434 U.S. 930, 98 S.Ct. 417, 54 L.Ed.2d 290 (1977). Admission of the evidence of appellant's purchase of expensive private real estate was a proper means of proving that appellant obtained substantial income or resources from his operation of a continuing narcotics enterprise. *United States v. Barnes*, 604 F.2d 121, 147 (2d Cir. 1979), *cert. denied*, 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980). Where a defendant is on trial for a crime in which pecuniary gain is the usual motive for or natural result of its perpetration and there is other evidence of his guilt, evidence of the sudden acquisition or expenditure of large sums of money by the defendant, at or after the time of the commission of the alleged offense, is admissible to demonstrate the defendant's illegal obtention of those funds. Evidence of this type is admissible even though the government does not specifically trace the source of those funds to the illegal acts charged against the defendant because "a dishonest acquisition

... [is] a natural and prominent hypothesis," 1 J. Wigmore, Evidence § 154, at 601 (1940 & Supp.1981), explaining the defendant's affluence. *United States v. Ariza-Ibarra*, 605 F.2d 1216, 1225, 1225 n.11 (1st Cir. 1979), *appeal after remand*, 651 F.2d 2 (1981); *United States v. Barnes, supra*, 604 F.2d at 147; *id.* (cases cited); *United States v. Viserto*, 596 F.2d 531, 536 (2d Cir. 1979); *United States v. Tramunti*, 513 F.2d 1087, 1105 (2d Cir.), *cert. denied*, 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975); *United States v. Rouse*, 494 F.2d 45, 46 (5th Cir. 1974) (per curiam); *United States v. Manning*, 440 F.2d 1105, 1110 (5th Cir.), *cert. denied*, 404 U.S. 837, 92 S.Ct. 125, 30 L.Ed.2d 69 (1971); *Hagan v. United States*, 245 F.2d 556, 557–58 (5th Cir. 1957) (per curiam); *United States v. Jackskion*, 102 F.2d 683, 684 (2d Cir.), *cert. denied*, 307 U.S. 635, 59 S.Ct. 1032, 83 L.Ed. 1517 (1939); *Commonwealth v. Mulrey*, 170 Mass. 103, 49 N.E. 91, 94 (1898) (Holmes, J.) In the present case there was sufficient evidence that appellant was engaged in a large-scale continuing narcotics enterprise so as to justify, under this principle, the admission as relevant and probative evidence of his receipt of large sums of money. That the funds for these acquisitions may have stemmed from entirely lawful activities, or, as appellant claims, from his gambling, goes to the weight of the evidence rather than to its admissibility. *United States v. Viserto, supra*, 596 F.2d at 536; *United States v. Tramunti, supra*, 513 F.2d at 1105.[21] Ad-

---

Capital Acquisitions, Inc., a corporation of which appellant was director and president.

**21.** Appellant's reliance upon *Williams v. United States*, 168 U.S. 382, 18 S.Ct. 92, 42 L.Ed. 509 (1897); *United States v. Dean*, 435 F.2d 1 (6th Cir. 1970); *Alexander v. United States*, 354 F.2d 59 (5th Cir. 1965), and *Neal v. United States*, 102 F.2d 643 (8th Cir. 1939), is misplaced. *Williams*, which has been severely criticized by Wigmore, *see* 1 J. Wigmore, *supra*, § 154, at 601 n.1, did not establish a general rule of evidence but instead simply constituted a narrow ruling on the particular facts of that case. *United States v. Ariza-Ibarra, supra*, 605 F.2d at 1225 n.11; *United States v. Tramunti, supra*, 513 F.2d at 1105 n.21; *United States v. Manning, supra*, 440 F.2d at 1109; *United States v. Jackskion, supra*, 102 F.2d at 684; *Self v. United States*, 249 F.2d 32, 34 n.2

(5th Cir. 1957). "[W]here ... the evidence overwhelmingly shows a 'necessary or natural connection' between the offense and the defendant the *Williams* rule does not apply." *United States v. Manning, supra*, 440 F.2d at 1109. That connection was met here. *See United States v. Tramunti, supra*, 513 F.2d at 1105; *United States v. Manning, supra*, 440 F.2d at 1109. *Alexander* and *Neal* are also inapposite for the reasons stated in *United States v. Manning, supra*, 440 F.2d at 1109–10. Moreover, contrary to appellant's contention, we have also rejected the argument that proof of unexplained acquisition of large sums of money is inadmissible without evidence of prior destitution. *United States v. Cavallino*, 498 F.2d 1200, 1204 (5th Cir. 1974); *Self v. United States, supra*, 249 F.2d at 34 n.2; *Hagan v. United States, supra*, 245 F.2d at 557–58.

mission of this evidence was entirely proper.

## V. SUFFICIENCY OF THE EVIDENCE

 Appellant contends that the evidence is insufficient to support his conviction under § 848 because the government failed to prove that he obtained substantial income or resources from his operation of a continuing criminal enterprise. We disagree.

The relevant standard for appellate review of the sufficiency of the evidence to support a criminal conviction is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Lerma*, 657 F.2d 786, 789 (5th Cir. 1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1279, 71 L.Ed.2d 463 (1982); *United States v. Young*, 655 F.2d 624, 626 (5th Cir. 1981). The jury is the ultimate arbiter of the credibility of witnesses, and, unless a witness' testimony is so incredible on its face that it defies physical laws, "[i]t is for [jurors] . . . and not for appellate courts, to say that a particular witness spoke the truth or fabricated a cock-and-bull story." *United States v. Bailey*, 444 U.S. 394, 414–15, 100 S.Ct. 624, 636, 62 L.Ed.2d 575 (1980); *United States v. Lerma, supra*, 657 F.2d at 789. Circumstantial evidence is entitled to the same weight as direct evidence in this calculus. *Holland v. United States*, 348 U.S. 121, 140, 75 S.Ct. 127, 137–38, 99 L.Ed. 150 (1948); *United States v. Hilburn*, 625 F.2d 1177, 1180 (5th Cir. 1980).

The government may prove that appellant obtained substantial income or resources from his operation of a continuing criminal enterprise by relying upon a variety of types of direct or circumstantial evidence. *United States v. Phillips, supra*, 664 F.2d at 1035; *id.* (authorities cited). Here, the government's proof took several such forms, each of which sufficed to prove appellant's profitable participation in drug trafficking. To begin with, appellant obtained several kilograms of cocaine and a large quantity of marijuana from this traffic despite the seizures, which would have brought appellant a handsome return. *See United States v. Phillips, supra*, 664 F.2d at 1034–1035 (possession of large quantity of marijuana sufficient). Appellant also contracted to sell large quantities of cocaine and marijuana thereby obtaining, in an accountant's terminology, a substantial amount of accounts receivable. *See United States v. Sisca*, 503 F.2d 1337, 1346 (2d Cir.), *cert. denied,* 419 U.S. 1008, 95 S.Ct. 328, 42 L.Ed.2d 283 (1974) ("consignment debt" represents a "substantial anticipated profit" rather than an "operational deficit"). In addition, the government also demonstrated that appellant was able to finance large-scale narcotics operations and lavish personal expenditures without having a legitimate source of income. *See United States v. Webster*, 639 F.2d 174, 182 (4th Cir. 1981) (evidence of large quantity of drugs moving into and out of defendant's possession sufficient); *United States v. Gantt*, 617 F.2d 831, 847 (D.C.Cir.1980) (defendant's ability to purchase large quantities of narcotics and to operate large-scale narcotics business evidence of obtention of substantial income or resources); *United States v. Barnes, supra*, 604 F.2d at 156 ("[t]he jurors were entitled to draw their own inferences from evidence of the galaxy of high-price automobiles, corporate-owned to shield them from forfeiture, used and/or leased by the defendants."); *United States v. Kirk*, 534 F.2d 1262, 1278 (8th Cir. 1976), *cert. denied,* 433 U.S. 907, 97 S.Ct. 2971, 53 L.Ed.2d 1091 (1977) (defendant's operation of a large-scale narcotics enterprise and ability to finance cross-country transportation expenses sufficient). This evidence, considered separately or together, is sufficient to support the jury's conclusion that appellant obtained substantial income or resources from his operation of a continuing criminal enterprise.

Appellant argues that the government may not rely upon the circumstantial evidence of his unexplained affluence to support his conviction under § 848 because such a theory shifts the burden of proof on this issue from the government to him in violation of *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975). This argument confuses the jury's right to draw an inference from a basic fact, established by circumstantial evidence, to an ultimate fact with a shift in the burden of proof on an ultimate fact. The jury is entitled to draw the eminently reasonable inference that a defendant running an expensive drug trafficking operation without another, legitimate and remunerative occupation is obtaining the funds to transact his business from his drug transactions. The possibility that the evidence in a particular case may be sufficiently persuasive to convince a jury to draw this inference rather than another unless the defendant offers an alternative explanation does not constitute a shift in the burden of persuasion; it simply means that the government's proof was sufficiently persuasive to convince the jury to find the defendant guilty. The defendant's complaint, therefore, is either that the government proved its case by circumstantial rather than direct evidence or that the government's circumstantial evidence was insufficient to prove its case. Neither complaint has merit.

22. Appellant also claims that the district court erred by permitting Quintoni to assert a blanket fifth amendment claim in violation of *United States v. Goodwin*, 625 F.2d 693 (5th Cir. 1980). We find no error in the actions of the district court.

23. *United States v. Thevis*, 665 F.2d 616, 638 (5th Cir. 1982); *United States v. D'Apice*, 664 F.2d 75, 76 (5th Cir. 1981); *United States v. Herbst*, 641 F.2d 1161, 1168–69 (5th Cir. 1981); *United States v. L'Hoste*, 640 F.2d 693, 695 (5th Cir. 1981); *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir. 1980); *United States v. Barham*, 625 F.2d 1221, 1226 (5th Cir. 1980), *cert. denied*, 450 U.S. 1002, 101 S.Ct. 1711, 68 L.Ed.2d 205 (1981); *In re Corrugated Container Anti-Trust Litigation*, 620 F.2d 1086, 1094–95 (5th Cir. 1980); *id.* at 1095 (Frank Johnson, J., dissenting on other grounds); *United States v. Beasley*, 550 F.2d 261, 268 (5th Cir. 1977);

## VI. DEFENSE WITNESS IMMUNITY

During trial, a government witness implicated John Quintoni, an associate of appellant's, in appellant's drug operations. Appellant subsequently questioned Quintoni out of the jury's presence regarding his knowledge of or participation in drug trafficking. Quintoni exercised his fifth amendment privilege against self-incrimination with respect to every question asked by appellant's counsel and refused to answer any of appellant's questions. Appellant's counsel then asked the district court to offer Quintoni use immunity under 18 U.S.C. § 6002 *et seq.* so that Quintoni could testify without fear of incrimination. The district court denied this request and appellant claims that the district court's refusal to grant Quintoni use immunity or to order the government to do so violated his right to a fair trial.[22] We disagree.

This Circuit has consistently held that a district court does not possess the statutory, common law, or inherent authority either to grant use immunity to a defense witness over the government's objection or to order the government to do so.[23] At the same time, we have also suggested without deciding that the federal constitution may in some extraordinary circumstances require either defense witness immunity or some remedial action by a district court to protect a defendant's right to a fair trial.[24] Appellant posits several potential bases for such a result,[25] but we find none of them persuasive.[26]

*United States v. Smith*, 436 F.2d 787, 790 (5th Cir.), *cert. denied*, 402 U.S. 976, 91 S.Ct. 1680, 29 L.Ed.2d 142 (1971).

24. *United States v. Herbst, supra*, 641 F.2d at 1169.

25. Appellant's Opening Brief at 68 n.11, citing, *e.g., Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) (compulsory process clause); *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 1921, 18 L.Ed.2d 1019 (1967) (same); *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038 (1973) (due process clause; compulsory process and confrontation clauses implicated); *Roviaro v. United States*, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1975) (informant's privilege).

26. Because there is no evidence of prosecutorial misconduct here, we need not consider

Our recent opinion in *United States v. Thevis*, 665 F.2d 616 (5th Cir. 1982) disposes of much of appellant's argument adversely to him. In *Thevis*, we held that a defendant has no federal constitutional right under the due process clause of the fifth amendment to defense witness immunity even though the testimony a defendant seeks to immunize is both exculpatory and unavailable from any other source. *United States v. Thevis, supra*, 665 F.2d at 638–640. We offered several reasons for our decision, *id.* at 640 & nn. 26 & 27, and concluded that "the immunity decision requires a balancing of public and private interests which should be left to the executive branch." *Id.* 665 F.2d at 640. *Thevis* requires us to reject this due process basis for defense witness immunity.

We also conclude that *Thevis* requires us to hold that any due process right to defense witness immunity cannot turn on whether the government proves its case against the defendant through the testimony of immunized witnesses. We rejected this basis in *Thevis* because the proffered defense testimony related to an issue which the government had established entirely through the use of non-immunized witnesses and because there was no evidence of governmental misconduct. *Id.* at 640–641. Nevertheless, we believe the balance between the government's interest in prosecuting accused felons and the accused's interest in presenting exculpatory and otherwise unobtainable evidence should not be inflexibly resolved by the fortuity that the government grants immunity to a particular witness in a particular case. If the government's prosecutorial interest outweighs a defendant's interest in presenting such evidence, as in *Thevis*, then the government's interest also outweighs any abstract concern with symmetry.[27] *See United States v. Turkish*, 623 F.2d 769, 774–75 (2d Cir. 1980) *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856 (1981); Note, *Defense Witness Immunity and the Right to a Fair Trial*, 129 U.Pa.L.Rev. 377, 402 (1980).

■ Appellant also relies upon the compulsory process clause of the sixth amendment. Our recent decision in *Thevis* did not consider the compulsory process clause as a basis for defense witness immunity. *United States v. Thevis, supra*, 665 F.2d at 638 n.23. We do not believe that the compulsory process clause supports the appellant's position.

We begin our analysis of this argument with the text of the compulsory process clause itself because "*the most important datum bearing on what was intended* [by the constitution] *is the constitutional language itself.*" J. Ely, Democracy and Distrust 16 (1980) (emphasis in original; bracketed material added). As Chief Justice Marshall put it, "the enlightened patriots who framed our constitution, and the people who adopted it, must be understood to have employed words in their natural sense, and to have intended what they said." *Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1, 188, 6 L.Ed. 23 (1824). The text of the clause simply states that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor." U.S.Const. amend. VI. The language of the clause suggests that it was intended to preserve a defendant's common law right to subpoena witnesses for his defense at trial. Lying side-by-side with the fifth amendment privilege

---

whether we would follow the Third Circuit's decisions in *Government of the Virgin Islands v. Smith*, 615 F.2d 964 (1980) and *United States v. Morrison*, 535 F.2d 223 (1976). *Webb v. Texas*, 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972) is inapposite for the same reason. *Cf. United States v. Thevis, supra*, 665 F.2d at 641 & n.28.

**27.** Appellant has not, and could not, argue that defense witness immunity is one of those

" 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' " *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2049, 52 L.Ed.2d 752 (1977), and thus qualifies as a right guaranteed to a defendant under that theory. *United States v. Turkish*, 623 F.2d 769, 774 n.2 (2d Cir. 1980), *cert. denied*, 449 U.S. 1077, 101 S.Ct. 856, 66 L.Ed.2d 800 (1981).

against self-incrimination, the language of the sixth amendment compulsory process clause does not suggest a right to supercede a witness' invocation of his own fifth amendment privilege or the right to demand that the government shield a witness from the consequences of his own testimony. Flanagan, *Compelled Immunity for Defense Witnesses: Hidden Costs and Questions*, 56 Notre Dame Law. 447, 472–73 (1981). Hence, the text of the clause does not assist appellant.

The history of the adoption of the clause and the history of its contemporaneous interpretation are also helpful to our analysis because that history cabins the range of potential interpretations that can be given to the constitutional text. Westen, *Confrontation and Compulsory Process: A Unified Theory of Evidence for Criminal Cases*, 91 Harv.L.Rev. 567, 568 (1978). That history demonstrates what the text of the clause suggests: that the clause was designed to ensure that a defendant would have the subpoena power available for his defense rather than to guarantee a defendant the unlimited right to present a defense without regard for the rules of evidence or the procedures governing a criminal trial. Nothing in the history of the adoption of the compulsory process clause suggests that it was designed to provide a defendant with the extraordinary right asserted here. Flanagan, *supra*, 56 Notre Dame Law. at 473–78. Therefore, the history of the adoption of the clause and the early history of its development also do not assist appellant.

The case law interpreting the scope of the clause also does not support the right to defense witness immunity. In *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967) and *Chambers v. Mississippi*, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) the Supreme Court struck down state evidentiary rules restricting a defendant's right to present the testimony of witnesses otherwise available to the defense. In both cases, however, the state rules were designed to exclude unreliable evidence in order to promote the factfinding process at trial. By contrast, privileges, such as a witness' fifth amendment privilege against self-incrimination, exclude even highly reliable evidence in order to promote social goals other than accurate factfinding in the criminal process. Neither *Washington* nor *Chambers* stands for the proposition that the compulsory process clause supercedes statutory or common law evidentiary privileges, much less the fifth amendment privilege against self-incrimination, as *Washington* itself noted. *Washington v. Texas*, *supra*, 388 U.S. at 23 n.21, 87 S.Ct. at 1925 n.21. *See* Flanagan, *supra*, 56 Notre Dame Law, at 479; Note, Defendant v. Witness, *Measuring Confrontation and Compulsory Process Rights Against Statutory Communications Privileges*, 30 Stan.L.Rev. 935, 952 & n.73 (1978). Similarly, neither the Supreme Court's decision in *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) nor Chief Justice Marshall's opinion as Circuit Justice in *United States v. Burr*, 25 F.Cas. 30 (C.C.D.Va.1807) (No. 14,692d) supports a right to defense witness immunity. In both cases, the court adverted to a defendant's compulsory process right in discussing a defendant's right to obtain evidence withheld from him by the government under a claim of executive privilege. The decisions are not apposite to the present issue. In the case now before us, it is a witness, not the government, who interposes his claim of privilege (founded on the Constitution) between himself and the defendant, and the government's refusal to remove an obstacle in the defendant's path simply cannot be equated with the government's placement of a barrier in the defendant's way. Therefore, the case law interpreting the scope of the compulsory process clause also does not support appellant.

Finally, we do not believe that the "right to present a defense," *Washington v. Texas*, *supra*, 388 U.S. at 19, 87 S.Ct. at 1923, ostensibly embodied by the clause, entitles a defendant to demand immunity for his witnesses. Generalizing a broad constitutional theory from isolated segments of prior opinions and transferring that theory to entirely different contexts substitutes aphorism for

analysis and leads to a domino-like development of constitutional law. *Battie v. Estelle*, 655 F.2d 692, 700 n.17 (5th Cir. 1981); Friendly, *The Bill of Rights as a Code of Criminal Procedure*, 53 Calif.L.Rev. 929, 950 (1965). *See also* L. Wittgenstein, *The Blue Book*, in The Blue and Brown Books 17–18 (1958). The development of federal constitutional law does not require a uniform, logical expansion of procedural protections for criminal defendants, *United States v. Mandujano, supra*, 425 U.S. at 580, 96 S.Ct. at 1778; *see* pp. 254–255 *supra*, and we must also consider the government's interests involved here. Requiring the government to offer use immunity to defense witnesses will erect an almost insurmountable barrier to any later prosecution of that witness for crimes he may have committed about which he testifies. *United States v. Thevis, supra*, 665 F.2d at 640 & nn. 26 & 27; *Flanagan, supra*, 56 Notre Dame Law. at 456–63. In some cases, defense witness immunity will make a later prosecution impossible and in some cases, not necessarily distinct from the first category, the federal interest in prosecution could be so great as to warrant freedom from this kind of interference in the executive branch's ability to prosecute. Federal courts are not equipped to make these type of decisions, however. *United States v. Thevis, supra*, 665 F.2d at 640. As we did in *Thevis*, we again conclude that the balancing of these interests should be left to the executive branch.

In conclusion, under the present circumstances, we can find no constitutional basis for the defendant's right to demand that the government offer transactional or use immunity to his witness.

## VII. CUMULATIVE PUNISHMENT

Appellant argues that the district court erroneously imposed cumulative fines for his violations of §§ 841 and 848.[28] The district court imposed a 15-year term of imprisonment, to be followed by a life-time special parole term, and a $25,000 fine upon appellant for violating § 841, and imposed a 30-year prison term and a $100,000 fine for violating § 848. The two prison terms were to run concurrently but the two fines were to be cumulated for a total fine of $125,000. We agree with appellant that the district court erroneously imposed cumulative fines.[29]

 Whether a district court may impose cumulative penalties upon a defendant convicted of several offenses is entirely a matter of legislative intent, and whether a district court does so is left to that court's sentencing discretion unless Congress intended to prevent a district court from imposing cumulative penalties. *See Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981); *United States v. Davis*, 656 F.2d 153, 157 (5th Cir. 1981). In this case, it appears that Congress did intend to limit a district court's sentencing authority. In *Jeffers v. United States*, 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), eight members of the Supreme Court concluded that Congress in-

---

**28.** Appellant argues that the cumulative fines were not authorized by the 1970 Drug Act and also violated the fifth amendment double jeopardy clause. At least where each statutory offense required proof of a fact that the other did not, our inquiry under either argument is the same. "[T]he question of what punishments are constitutionally permissible [under the double jeopardy clause] is not different from the question of what punishment the Legislative Branch intended to be imposed. Where Congress intended . . . to impose multiple punishments, imposition of such sentences does not violate the Constitution." *Albernaz v. United States*, 450 U.S. 333, 344, 101 S.Ct. 1137, 1145, 67 L.Ed.2d 275 (1981) (footnote omitted). *See United States v. Davis*, 656 F.2d 153, 157 (5th Cir. 1981). *See also United*

*States v. Hawkins*, 658 F.2d 279, 286 & n.12 (5th Cir. 1981).

**29.** The district court may have recognized this error and attempted to correct it in its written judgment and commitment order which does not cumulate the fines. However, we must refer to the oral sentence pronounced in court when there is a variance between the oral and written versions of the same sentence. *Schurmann v. United States*, 658 F.2d 389, 391 (5th Cir. 1981). An appellate court may refer to the written judgment in order to clarify an ambiguous oral sentence, *Schurmann v. United States, supra*, 658 F.2d at 391, but may not use the written judgment to impeach the oral sentence. Accordingly, we must refer to the district court's oral sentence because it is unambiguous.

tended to prevent a district court from imposing a punishment for violating a predicate section of the 1970 Drug Act, there § 846, atop a punishment imposed upon a defendant for violating § 848. *Id.* at 156–58, 97 S.Ct. at 2219–20 (plurality opinion); *id.* at 160, 97 S.Ct. at 2221 (Stevens, J., dissenting in part and concurring in the judgment in part). According to *Jeffers*, "[s]ection 848 itself reflects a comprehensive penalty structure that leaves little opportunity for pyramiding of penalties from other sections of [the 1970 Drug Act].... Since every § 848 violation by definition will also involve a series of other felony violations of the Act, see §§ 848(b)(1), (2), there would have been no point in specifying maximum fines for the § 848 violation if cumulative punishment was to be permitted." *Id.* at 156, 97 S.Ct. at 2219.[30] *Jeffers* interpretation of the 1970 Drug Act disposes of this question in appellant's favor and requires that the fine imposed upon him be lowered to $100,000, the amount he was fined for violating § 848.[31]

## VIII. PAROLE ELIGIBILITY

Appellant's final argument is that he has a right under 18 U.S.C. § 4205 to have the district court consider setting a date for him at which he would be eligible for parole. Appellant advances this claim even though he was convicted of violating 21 U.S.C. § 848 which otherwise would deny him the right to parole. Appellant's elaborate argument goes as follows.

Subsection (c) of 21 U.S.C. § 848 states that "[i]n the case of any sentence imposed under this section, imposition or execution of such sentence shall not be suspended, probation shall not be granted, and section 4202 of Title 18 and the Act of July 15, 1932 (D.C.Code, secs. 24–203 to 24–207), shall not apply." The "section 4202 of Title 18" referred to in § 848(c) was the former federal statute establishing general parole eligibility criteria. This version of § 4202 was repealed in 1976, however, by the Parole Commission and Reorganization Act (the 1976 Parole Act) which reorganized the entire parole decisionmaking structure and process. The current version of § 4202 established the Parole Commission,[32] and the general parole criteria formerly codified at § 4202 are now codified at § 4205.[33] Appellant argues that Congress' repeal of former § 4202, coupled with its failure to

---

**30.** The government has argued that we should apply the test established in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932) to determine whether the district court acted correctly in imposing cumulative fines upon appellant. Under *Blockburger*, a district court may impose cumulative punishment upon a defendant convicted of violating two different statutes where "each provision requires proof of a fact which the other does not." *Id.* at 304, 52 S.Ct. at 182. But, as the Supreme Court held last term in *Albernaz v. United States*, 450 U.S. 333, 340, 101 S.Ct. 1137, 1143, 67 L.Ed.2d 275 (1981), "[t]he *Blockburger* test is a 'rule of statutory construction,' and because it serves as a means of discerning congressional purpose the rule should not be controlling where, for example, there is a clear indication of contrary legislative intent." The discussion of Congressional intent in *Jeffers* requires us to conclude that Congress intended to deny a district court the authority to impose cumulative punishments here.

**31.** Because the two prison terms will run concurrently, they are unaffected by our decision regarding the cumulative fines.

**32.** Current § 4202 provides:

There is hereby established, as an independent agency in the Department of Justice, a United States Parole Commission which shall be comprised of nine members appointed by the President, by and with the advice and consent of the Senate. The President shall designate from among the Commissioners one to serve as Chairman. The term of office of a Commissioner shall be six years, except that the term of a person appointed as a Commissioner to fill a vacancy shall expire six years from the date upon which such person was appointed and qualified. Upon the expiration of a term of office of a Commissioner, the Commissioner shall continue to act until a successor has been appointed and qualified, except that no Commissioner may serve in excess of twelve years. Commissioners shall be compensated at the highest rate now or hereafter prescribed for grade 18 of the General Schedule pay rates (5 U.S.C. 5332).

**33.** Current § 4205 provides:

(a) Whenever confined and serving a definite term or terms of more than one year, a prisoner shall be eligible for release on parole after serving one-third of such term or terms

amend § 848(c) to refer to the new § 4205 rather than to the former § 4202, effectively repealed the bar to parole established by § 848(c). Therefore, he is entitled to have the district court consider setting a parole eligibility date for him under the current version of § 4205 just as a district court may for any other prisoner. We disagree.[34]

Appellant's "elaborate argument . . . does not need an elaborate answer." *Unit-ed States v. Wurzbach*, 280 U.S. 396, 399, 50 S.Ct. 167, 169, 74 L.Ed. 508 (1930). The short answer to appellant's argument is that Congress' failure to modify § 848(c) when enacting the 1976 Parole Act was simply an accidental oversight of no consequence rather than a considered choice to repeal the bar to parole established only six years earlier in § 848(c). Straightforward application of several principles of federal

---

or after serving ten years of a life sentence or of a sentence of over thirty years, except to the extent otherwise provided by law.

(b) Upon entering a judgment of conviction, the court having jurisdiction to impose sentence, when in its opinion the ends of justice and best interest of the public require that the defendant be sentenced to imprisonment for a term exceeding one year, may (1) designate in the sentence of imprisonment imposed a minimum term at the expiration of which the prisoner shall become eligible for parole, which term may be less than but shall not be more than one-third of the maximum sentence imposed by the court, or (2) the court may fix the maximum sentence of imprisonment to be served in which event the court may specify that the prisoner may be released on parole at such time as the Commission may determine.

(c) If the court desires more detailed information as a basis for determining the sentence to be imposed, the court may commit the defendant to the custody of the Attorney General, which commitment shall be deemed to be for the maximum sentence of imprisonment prescribed by law, for a study as described in subsection (d) of this section. The results of such study, together with any recommendations which the Director of the Bureau of Prisons believes would be helpful in determining the disposition of the case, shall be furnished to the court within three months unless the court grants time, not to exceed an additional three months, for further study. After receiving such reports and recommendations, the court may in its discretion: (1) place the offender on probation as authorized by section 3651; or (2) affirm the sentence of imprisonment originally imposed, or reduce the sentence of imprisonment, and commit the offender under any applicable provision of law. The term of the sentence shall run from the date of original commitment under this section.

(d) Upon commitment of a prisoner sentenced to imprisonment under the provisions of subsections (a) or (b) of this section, the Director, under such regulations as the Attorney General may prescribe, shall cause a complete study to be made of the prisoner and shall furnish to the Commission a summary report together with any recommenda-tions which in his opinion would be helpful in determining the suitability of the prisoner for parole. This report may include but shall not be limited to data regarding the prisoner's previous delinquency or criminal experience, pertinent circumstances of his social background, his capabilities, his mental and physical health, and such other factors as may be considered pertinent. The Commission may make such other investigation as it may deem necessary.

(e) Upon request of the Commission, it shall be the duty of the various probation officers and government bureaus and agencies to furnish the Commission information available to such officer, bureau, or agency, concerning any eligible prisoner or parolee and whenever not incompatible with the public interest, their views and recommendation with respect to any matter within the jurisdiction of the Commission.

(f) Any. prisoner sentenced to imprisonment for a term or terms of not less than six months but not more than one year shall be released at the expiration of such sentence less good time deductions provided by law, unless the court which imposed sentence, shall, at the time of sentencing, provide for the prisoner's release as if on parole after service of one-third of such term or terms notwithstanding the provisions of section 4164. This subsection shall not prevent delivery of any person released on parole to the authorities of any State otherwise entitled to his custody.

(g) At any time upon motion of the Bureau of Prisons, the court may reduce any minimum term to the time the defendant has served. The court shall have jurisdiction to act upon the application at any time and no hearing shall be required.

(h) Nothing in this chapter shall be construed to provide that any prisoner shall be eligible for release on parole if such prisoner is ineligible for such release under any other provision of law.

**34.** Because the district court could set a parole eligibility date for appellant at this time, we reject the government's argument that the issue is not now ripe for consideration.

constitutional law and statutory construction demonstrates the correctness of this conclusion.

■■■■ A valid conviction and sentence extinguishes a defendant's right to liberty otherwise protected by the due process clause of the fifth or fourteenth amendments for the length of the sentence imposed. *Connecticut Board of Pardons v. Dumschat,* 452 U.S. 458, 463–64, 101 S.Ct. 2460, 2463–64, 69 L.Ed.2d 158 (1981); *Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex,* 442 U.S. 1, 7, 99 S.Ct. 2100, 2104, 60 L.Ed.2d 668 (1979); *Meachum v. Fano,* 427 U.S. 215, 224, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *cf. Spinkellink v. Wainwright,* 578 F.2d 582, 619 (5th Cir. 1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979) (valid capital sentence extinguishes defendant's life interest otherwise protected by due process clause). *See also Jago v. Van Curen,* —— U.S. ——, 102 S.Ct. 31, 70 L.Ed.2d 13 (1981) (per curiam). Accordingly, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz, supra,* 442 U.S. at 7, 99 S.Ct. at 2104; *Dumschat, supra,* 452 U.S. at 463–64, 101 S.Ct. at 2463–64. Obtaining an early release through parole, like obtaining a pardon, is wholly contingent upon either the grace of the detaining authority or some affirmative statutory entitlement. *Greenholtz, supra* (parole); *Dumschat, supra* (pardon). The question here is whether appellant has some affirmative statutory entitlement to parole.

As with any problem of statutory analysis, we must begin our inquiry into Congressional intent with the language of the statutes themselves. *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981); *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 702, 66 L.Ed.2d 633 (1981). If the statutory language is unambiguous, that language must ordinarily be regarded as conclusive in the absence of a clearly expressed legislative intent to the contrary. *Consumer Product Safety Commission v. GTE Sylva-*

*nia, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980). Where, as here, several different statutes are involved, we must interpret each statute in a manner consistent with Congress' intent for each separate statute. *Howe v. Smith,* 452 U.S. 473, 479, 101 S.Ct. 2468, 2473, 69 L.Ed.2d 171 (1981). Moreover, "repeals by implication are not favored," *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936); *TVA v. Hill,* 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978), and "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari,* 417 U.S. 535, 550, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *St. Martin Evangelical Lutheran Church v. South Dakota,* 451 U.S. 772, 788, 101 S.Ct. 2142, 2151, 68 L.Ed.2d 612 (1981).

■■■ In order for appellant to prevail, the 1976 Parole Act must be held to have produced one of two results: either the repeal of former § 4202 accomplished by the Act by itself amended § 848(c) or the 1976 Parole Act explicitly or implicitly modified § 848(c) by virtue of the statute enacted by that law. We do not find either interpretation tenable.

The repeal of former § 4202 performed by the 1976 Parole Act did not by itself amend § 848(c). Prior to the adoption of the 1976 Parole Act, § 848(c) clearly denied a person in appellant's position the opportunity to be considered for parole. *Jeffers v. United States, supra,* 432 U.S. at 156, 97 S.Ct. at 2219. The reference in § 848(c) to former § 4202 was simply a shorthand method of stating that persons convicted under § 848 could not obtain parole. Congress accomplished this objective by incorporating by reference the then current federal statutes establishing parole. "The Congress was plainly interested in punishing the professional criminal severely when it passed § 848," *Jeffers v. United States, supra,* 432 U.S. at 155 n.26, 97 S.Ct. at 2219 n.26, and nothing in the legislative history

of the 1970 Drug Act indicates that Congress intended its reference in § 848(c) to former § 4202 to indicate anything other than that persons convicted of violating § 848(c) could not obtain parole. H.R.Rep. No.91–1444, 91st Cong., 2d Sess. (pt. 1) 50 (1970); S.Rep.No.91–613, 91st Cong., 1st Sess. 27–28 (1969), U.S.Code Cong. & Admin.News 1970, p. 4566. The bar to parole established by § 848(c) exists independently from the federal parole statutes and, therefore, any modification in these statutes which does not also modify § 848(c) leaves the bar to parole established by § 848(c) entirely unaffected. Had Congress repealed § 4202 and failed to substitute any new parole law in its place, appellant could not obtain parole under any law. Accordingly, the only remaining question is whether the 1976 Parole Act explicitly or implicitly modified § 848(c).

The answer to this question is clear: neither the language of the 1976 Parole Act, its legislative history, or the policies motivating Congress to adopt the act suggests any Congressional intent to permit persons convicted of violating § 848(c) to be considered for parole. Section 4205, like its predecessor § 4202, establishes general criteria for eligibility for parole, but neither § 4205 nor any other section of the 1976 Parole Act purports to supercede any other federal law denying a prisoner the opportunity for parole. In fact, § 4205(h) specifically states that "[n]othing in this chapter shall be construed to provide that any prisoner shall be eligible for such release on parole [as provided by the 1976 Parole Act] if such prisoner is ineligible for such release under any other provision of law." By its terms, § 4205(h) recognizes that statutes other than the 1976 Parole Act may deny a prisoner the opportunity for parole and carries forward the effect of those other statutes. The language of the 1976 Parole Act undercuts appellant's argument. *United States v. Valenzuela*, 646 F.2d 352, 354 (9th Cir. 1980).

Appellant attempts to avoid the force of § 4205(h) by arguing that the term "prisoners" referred to in that subsection includes only those persons incarcerated at the time the Act was adopted and does not include persons convicted after that date. This interpretation is untenable. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin v. United States*, 444 U.S. 37, 42, 100 S.Ct. 311, 314, 62 L.Ed.2d 199 (1979). *Accord County of Washington v. Gunther*, 452 U.S. 161, 169, 101 S.Ct. 2242, 2247 & n.9, 68 L.Ed.2d 751 (1981). "Prisoner" is normally understood to refer to a person deprived of his liberty through incarceration in a prison. The Random House Dictionary of the English Language 1145 (1966). Appellant's interpretation narrows the term "prisoner" beyond its normal interpretation. Had Congress intended to limit the scope of this term exclusively to persons already incarcerated at the time of the adoption of the 1976 Parole Act, it could easily have done so simply by inserting those qualifying terms. Congress did not narrow the ambit of that term and for us to do so " 'is not to construe the Act but to amend it.' " *Fedorenko v. United States*, 449 U.S. 490, 513, 101 S.Ct. 737, 751, 66 L.Ed.2d 686 (1981) (citation omitted). *Cf. United States v. Turkette, supra*, 452 U.S. at 580, 101 S.Ct. at 2527, (refusing to modify the word "enterprise" by adding word "illegitimate"). Moreover, appellant's interpretation finds no support in the legislative history. S.Conf.Rep.No. 94–648, 94th Cong., 2d Sess. (1976); H.Conf. Rep.No.94–648, 94th Cong., 2d Sess. (1976); S.Rep.No.94–369, 94th Cong., 1st Sess. (1975); H.Rep.No.94–184, 94th Cong., 1st Sess. (1975); 122 Cong.Rec. 5162, 5162–65 (1976) (House); 122 Cong.Rec. 4861, 4861– 62 (1976) (Senate); 121 Cong.Rec. 28829, 28829–33 (1975) (Senate); 121 Cong.Rec. 15700, 15700–16 (1975) (House). Finally, appellant's interpretation is internally inconsistent. Only "prisoners" are eligible for parole at all. § 4205(a), (b), (f). *See also* § 4201(4) (defining "[e]ligible prisoner"). Therefore, unless appellant is a "prisoner," the 1976 Parole Act is inapplicable to him, and if appellant is a "prisoner," § 4205(h) is applicable.

"When the terms of a statute are unambiguous, our inquiry comes to an end, except 'in "rare and exceptional circumstances."'" *Howe v. Smith, supra,* 452 U.S. at 483, 101 S.Ct. at 2475 (citations omitted). No such circumstances are present here because our interpretation of the legislative history of the 1976 Parole Act is fully consistent with our reading of its language. Congress passed the Act in order to promote more efficient and less arbitrary decision making in cases where the prisoner is otherwise eligible for parole. Nothing in the legislative history suggests that Congress intended to broaden the scope of persons generally eligible for parole or to amend § 848(c) and thereby permit this type of professional criminal to be released on parole. Indeed, § 848(c) was never mentioned by anyone, anywhere in the legislative history.

In conclusion, appellant has no affirmative statutory entitlement to parole and the district court did not err by refusing to consider setting a parole eligibility date for appellant under § 4205.

## IX. SUMMARY

The cumulative fine imposed upon appellant must be vacated and the district court is directed to lower the fine from $125,000 to $100,000. In all other respects, the judgment of the district court is affirmed.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.

APPENDIX

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

EL PASO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. *EP 79-CR-91* |
| Plaintiff | SUPERSEDING INDICTMENT TO MO-79-CR-6 |
| VS. | [Vio: 21 U.S.C. § 963 – Conspiracy to import controlled substance; 21 U.S.C. § 841(a)(1) & 18 U.S.C. § 2 – Aiding and abetting the possession of narcotic drug with intent to distribute; 21 U.S.C. § 848 – Continuing criminal enterprise] |
| JAMIEL ALEXANDER CHAGRA, A/K/A JIM ALEXANDER | |
| Defendant | |

THE GRAND JURY CHARGES:

COUNT ONE

[21 U.S.C. § 963]

That beginning on or before June 1, 1977, and continuing until on or about April 1, 1978, in the Western District of Texas, the States of Florida, New Mexico, Colorado, Oklahoma, the Republic of Mexico, the Republic of Colombia, and divers other places to the grand jurors unknown, Defendant JAMIEL ALEXANDER CHAGRA A/K/A JIM ALEXANDER and other persons to the grand jurors known and unknown, unlawfully, wilfully and knowingly did combine, conspire, confederate and agree together and with each other to import marijuana, a Schedule I Controlled Substance, into the United States from the Republic of Colombia, contrary to Title 21, United States Code, Section 952(a), and in violation of Title 21,

United States Code, Section 963; and to effect the objects of said conspiracy, the following overt acts were committed:

1. On or about July 28, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER and Henry Wallace had a meeting in Berino, New Mexico.

2. On or about July-August, 1977, Henry Wallace and William Dudley Connell had a meeting in El Paso, Texas.

3. On or about September 17, 1977, Jim French and Henry Wallace purchased aircraft N6124X in Oklahoma City, Oklahoma, in the name of Richard Young.

4. On or about September 26, 1977, Henry Wallace departed El Paso, Texas, to meet Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER in Miami, Florida.

5. On or about September 27, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER and Henry Wallace obtained a false passport in the name of Robert Rosson.

6. On or about September 28, 1977, Henry Wallace left Miami, Florida, for the Republic of Colombia.

7. On or about October 18, 1977, William Dudley Connell in El Paso, Texas, had a telephone conversation with Henry Wallace.

8. On or about October 18, 1977, William Dudley Connell in El Paso, Texas, had a telephone conversation with Paul Taylor.

9. On or about October 19, 1977, Paul Taylor traveled from Denver, Colorado, to El Paso, Texas.

10. On or about October 19, 1977, Paul Taylor obtained a passport in Juarez, Mexico.

11. On or about October 20, 1977, Paul Taylor departed El Paso, Texas, for the Republic of Colombia.

12. On or about October 21, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER and Jim French departed Miami, Florida, in aircraft N6124X and attempted to import a quantity of cocaine from the Republic of Colombia.

13. On or about October 26, 1977, Paul Taylor departed the Republic of Colombia and returned to the United States.

14. On or about November 1, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER and Jim French imported a quantity of cocaine from the Republic of Colombia.

15. On or about November 26, 1977, William Dudley Connell and Paul Taylor departed El Paso, Texas, for Miami, Florida.

16. On or about November 26, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER delivered a quantity of cocaine to William Dudley Connell and Paul Taylor.

17. On or about November 28, 1977, William Dudley Connell arrived in El Paso, Texas, with a quantity of cocaine.

18. On or about December 4, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER had a telephone conversation with Paul Taylor.

19. On or about December 19, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER had a meeting in Broward County, Florida, to arrange the off-loading of ships containing marijuana.

20. On or about December 22, 1977, the ship "Dona Petra" departed Camarones, Colombia, with a quantity of marijuana.

21. On or about January 3, 1978, Henry Wallace traveled to the island of Aruba.

22. On or about January 10, 1978, Henry Wallace traveled to Juarez, Mexico.

23. On or about March 20–24, 1978, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER caused a quantity of marijuana to be delivered in Davie, Florida.

## COUNT TWO

### [21 U.S.C. § 963]

That beginning on or before June 1, 1977, and continuing until on or about April 1, 1978, in the Western District of Texas, the States of Florida, New Mexico, Colorado, Oklahoma, the Republic of Mexico, the Re-

public of Colombia, and divers other places to the grand jurors unknown, Defendant

**JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER**

and other persons to the grand jurors known and unknown, unlawfully, wilfully and knowingly did combine, conspire, confederate and agree together and with each other to import cocaine, a Schedule II Narcotic Drug Controlled Substance, into the United States from the Republic of Colombia, contrary to Title 21, United States Code, Section 952(a), and in violation of Title 21, United States Code, Section 963.

To effect the objects and purposes of said conspiracy, overt acts one through eighteen in Count One of this Indictment are hereby incorporated by reference.

## COUNT THREE

[21 U.S.C. § 841(a)(1) & 18 U.S.C. § 2]

1. That on or about November 28, 1977, in the Western District of Texas, William Dudley Connell (the said William Dudley Connell being named as a principal but not as a defendant herein) unlawfully and intentionally did possess with intent to distribute a quantity of cocaine, a Schedule II Narcotic Drug Controlled Substance, in violation of Title 21, United States Code, Section 841(a)(1).

2. That Defendant, JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER, aided, abetted, counseled, induced and procured the commission of the offense alleged above in violation of Title 18, United States Code, Section 2.

## COUNT FOUR

[21 U.S.C. § 848]

That beginning on or about April 1, 1974, and continuously thereafter up to and including April 1, 1978, in the Western District of Texas, the States of Florida, New Mexico, Colorado, Oklahoma, Connecticut, Pennsylvania, the Republic of Mexico, the Republic of Colombia, and divers other places to the grand jurors unknown, Defendant

**JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER**

unlawfully, knowingly, and intentionally violated Sections 841, 846, 952, 963, Title 21, United States Code, as alleged in Counts One, Two and Three of this Indictment (said counts being incorporated herein by reference), and as follows:

1. On or about April 22, 1974, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER caused approximately 1,000 pounds of marijuana to be delivered to Connecticut.

2. On or about the summer 1974, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER distributed approximately two ounces of cocaine in El Paso, Texas.

3. On or about October 1974 Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER caused approximately 2,000 pounds of marijuana to be delivered to Pittsburgh, Pennsylvania.

4. On or about December 30, 1976, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER caused approximately 17,000 pounds of marijuana to be delivered to Ardmore, Oklahoma.

5. On or about June 11, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER attempted to import a quantity of marijuana from the Republic of Colombia.

6. On or about October 21, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER attempted to import a quantity of cocaine from the Republic of Colombia.

7. On or about November 1, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER imported a quantity of cocaine from the Republic of Colombia.

8. On or about November 25, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER distributed a quantity of cocaine in Ft. Lauderdale, Florida.

9. On or about December 26, 1977, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER caused a quantity of marijuana to be imported into the United States from off the coast of Florida.

10. On or about February 1978, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER delivered a quantity of cocaine in Ft. Lauderdale, Florida.

11. On or about March 26, 1978, Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER caused a quantity of marijuana to be delivered in Davie, Florida;

which violations were part of a continuing series of violations of the Controlled Substances Act, Title 21, United States Code, Section 801, et seq., and the Controlled Substances Import and Export Act, Title 21, United States Code, Section 951, et seq., undertaken by Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER in concert with at least five other persons with respect to whom Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER, occupied a position of organizer, a supervisory position, and any other position of management, and from which such continuing series of violations Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER, obtained substantial income and resources, of which the United States seeks forfeiture, including all profits obtained by the Defendant JAMIEL ALEXANDER CHAGRA a/k/a JIM ALEXANDER in such continuing criminal enterprise, and of his interest in, claim against, and property and contractual right of any kind affording a source of influence over such enterprise, all in violation of Title 21, United States Code, Section 848.

A TRUE BILL.

_____
Foreman

JAMIE C. BOYD
United States Attorney